**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **GREG KIHN, ET AL.,** | CASE NO. 17-cv-05343-YGR |
| Plaintiffs, | **ORDER GRANTING MOTION FOR CLASS CERTIFICATION; GRANTING IN PART AND DENYING IN PART MOTIONS TO SEAL** |
| vs. | |
| **BILL GRAHAM ARCHIVES, LLC, ET AL.,** | Dkt. No. 107, 109, 120, 126, 128, 145, 167 |
| Defendants. | |

This case arises from defendants' exploitation of audio and video recordings of live musical performances, and the musical compositions performed therein, from the 1950s to the 1990s. Plaintiffs Greg Kihn and Rye Boy Music, LLC (Kihn's music publisher) allege that defendants Bill Graham Archives, LLC dba Wolfgang's Vault; Norton, LLC; and William Sagan distributed and sold in thousands of recordings acquired from a dozen private collections—recordings that captured live performances spanning several decades, made by concert producers and sound engineers without the performers' authorization. Plaintiffs allege that the conduct began in 2006 when defendants began offering digital downloads or on-demand streaming on two websites: (1) wolfgangs.com, which offers audio recordings; and (2) concertvault.com, which offers both audio and audiovisual recordings for on-demand streaming (hereinafter, "Websites").[1]

---

[1] Defendants also launched a "Music Vault" YouTube channel in early 2014, offering audiovisual recordings from the collections at issue for on-demand streaming. (Declaration of William Sagan, Dkt. No. 110-1, ¶¶ 30-32.)

Plaintiffs Kihn and Rye Boy bring this motion seeking to certify two classes: a Composer Class and a Performer Class.[2] With respect to the Composer Class, plaintiff Rye Boy seeks to represent a putative class of composers of musical works alleging infringement of copyrighted musical compositions based upon unauthorized sale and distribution of sound recordings and audiovisual recordings. With respect to the Performer Class, plaintiff Kihn seeks to represent a putative class of live music performers, alleging that defendants trafficked in recordings of their live musical performances without authorization in violation of 17 U.S.C. section 1101.

Defendants oppose class certification arguing that plaintiffs cannot meet any of the requirements to certify a class under either Rule 23(b)(2) or (b)(3). In summary, they contend that individualized issues arise from the creation and ownership of the live music recordings, as well as from licensing arrangements and their alleged defenses of consent, fair use, and untimeliness. While defendants raise arguments in their opposition as to all the elements of Rule 23, the focus of the fight here is whether common issues of fact and law would predominate, as required by Rule 23(b)(3).

As set forth more fully herein, with respect to the Composer Class, the Court concludes plaintiffs' *prima facie* case for copyright infringement may be established readily on common evidence. In opposition to class certification, defendants have put forward a common set of contractual agreements, applicable to the entire class, which they contend preclude liability. Consequently, the Court concludes that common issues of fact and law would predominate on the

---

[2] In response to defendants' opposition on the grounds that the class definitions in the complaint constituted impermissible "fail-safe" classes, plaintiffs narrowed their proposed definitions as follows:

Composer Class: All owners of copyrights in the musical compositions that were recorded at a non-studio performance which have been reproduced, performed, distributed, or otherwise exploited by Defendants during the period from September 14, 2014 to the present.

Performer Class: All persons whose non-studio performances are fixed on the sound recordings and audiovisual works which have been reproduced, performed, distributed, or otherwise exploited by Defendants during the period from September 14, 2014 to the present.

(*See* Reply Brief at 3:1-9.)

2

copyright infringement claims and the Composer Class should be certified.

For much the same reasons, the Court concludes that common issues would predominate on the section 1101 claim of the Performer Class. As explained below, the Court has considered the novel legal question of the evidentiary burdens on a claim under section 1101. Having carefully examined the text and purposes of the statute, as well as principles of evidence and statutory interpretation bearing on the question, the Court finds the authorization requirement is an affirmative defense, and defendants bear the burden to establish authorization. As with their affirmative defenses to the Composer Class's claims, defendants' opposition to certification of the Performer Class relies on the same limited number of agreements, applicable to all class members, for their contention that the recordings and their exploitation were authorized. Thus, on the record put forward by the parties at class certification, common issues of fact and law predominate on the Performer Class's section 1101 claim, and certification of the Performer Class is appropriate.

Accordingly, having carefully considered the papers submitted, the pleadings in this action, the admissible evidence,[3] and the arguments of the parties, and for the reasons set forth below, the Court **GRANTS** the Motion for Class Certification of: (1) a Composer Class for copyright infringement, and (2) a Performer Class for violation of the Anti-Bootlegging Statute, 17 U.S.C. section 1101 as defined herein.

## I. ADMINISTRATIVE MOTIONS TO SEAL

As a preliminary matter, both sides have submitted administrative motions to seal documents or portions of documents offered in support of their class certification briefing and supplemental briefing. (Dkt. Nos. 98, 109, 120, 126, 128, 145, 167.) While the standard for

---

[3] Plaintiffs filed an administrative motion to supplement evidence in the class certification record with documents showing communications between the Copyright Office and defendants regarding sound recordings at issue. (Motion for Relief to File Supplemental Evidence, Dkt. No. 126-4; Declaration of Matthew A. Pearson, Dkt. 126-5, Exh. A and B.) The motion to supplement is **GRANTED**.

Subsequent to the hearing, defendants produced a chart listing the recordings on their Websites and a cover letter from counsel. (Dkt. No 145-1, 145-2.) Plaintiffs objected to the documents as argumentative and requested to strike them. (Dkt. No. 147.) To the extent that the letter or chart offer arguments which were not made in defendants' papers regarding certain performers' concession of defendants' ownership, the objection is **SUSTAINED**. Otherwise, the documents do no more than repeat defendants' prior arguments and the objection is **OVERRULED**.

United States District Court
Northern District of California

1    sealing documents in connection with class certification does not require "compelling reasons" as

2    set forth in *Pintos v. Pacific Creditors Ass'n,* 605 F.3d 665, 678 (9th Cir. 2010), the Court

3    nevertheless finds that the sealing requests here are overbroad and good cause has not been

4    established to seal certain documents to the extent requested.  The Court has considered the basis

5    offered for sealing, as well as the significance to the Court's decision of the portions sought to be

6    sealed, in determining which portions to cite or quote in its order herein.  The motions to seal are

7    granted only insofar as they are not necessary to the Court's analysis.

8        Therefore, to the extent the Court has ***quoted or recited the contents of*** any specific

9    portion of a document in this decision, the motion to seal that information is **DENIED** for lack of

10   good cause.  The motions to seal (Dkt. Nos. 98, 109, 120, 126, 128, 145, 167) are otherwise

11   **GRANTED** for good cause shown.[4]

12   **II.    BACKGROUND**

13       Defendants acquired collections of audio and audiovisual recordings capturing the live

14   musical performances of more than 900 musical artists, spanning the decades from the 1950's

15   through 1990's.  In 2002, defendants purchased the archives from the estate of deceased San

16   Francisco Bay Area rock concert promoter Bill Graham.  (Weiner Decl. Exh. 2.)  Graham had

17   amassed a large personal collection of thousands of recordings from the concerts he promoted in

18   the San Francisco Bay Area.  (*See* Weiner Decl. Exh. 3.)  Defendants contend that they made this

19   purchase with the understanding that they were acquiring ownership of the "master recordings"[5]

20

21

---

22   [4] The Court notes that any party seeking to seal documents in connection with any later
     motion or trial must make an appropriate showing at that time.

23
     [5] The term "master recording" is one of many terms of art in the realm of music copyright.
24   As stated by the Ninth Circuit:

25       Sound recordings are [copyrightable] works that result from the fixation of a
         series of sounds. Fixation, as defined by the Copyright Office, occurs when a
26       complete series of sounds is first produced on a final *master recording* that is later
         reproduced in published copies.

27   *United States v. Taxe*, 540 F.2d 961, 965 (9th Cir. 1976) (internal citations omitted, emphasis
     supplied).

28

in the Bill Graham Archive.  (*See* Weiner Decl. Exh. 1 [Sagan Depo.] at 147:10-17.)[6]  Thereafter, defendants acquired the rest of the recordings from about twelve other third-party sources, mostly concert producers and sound engineers.  (*See* Weiner Decl. Exhs. 4-16, "Acquisition Agreements").[7]  Nearly all of those agreements included substantially the same representations concerning knowledge and consent of the performers in the recordings:

> *To the best of Seller's knowledge and belief*, any and all performers whose performance is captured in the Recordings *were fully aware of, and expressly approved of and consented to, the making of the Recordings*.  The performers included in the Recordings *did not impose*, either orally or in writing, *any restrictions or requirements on Seller on any use or exploitation* of any the Recordings that resulted from such recording and have never, to Seller's knowledge, asserted any ownership interest in or other rights to such Recordings.

(Sagan Decl., Exh. E [Brower Agreement] at § 4(f) (emphasis supplied); *see also* Exh. C [Festival Network] at §4(e); Exh. F [Plainfield Music] at § 4(h); Exh. G. [Hewitt] at §4(f); Exh. I [Dawson] at § 4(f); Exh. J [Amazingrace] at § 7(f); Exh. K [Filmsonix] at § 4(g); Exh. L [Fuel 2000] at §4(f); Exh. M [Ash Grove Theater] at 4(f)); *compare id.* Exh. H. [Tramps Club] at §4(f) substituting the words "*and did not object to*" instead of "approved of and consented to").[8]

---

[6]  The agreement qualified the definition of "Assets" to include "all Intellectual Property rights . . . that relate exclusively to the Assets *to the extent that either Seller or any of its Affiliates possesses such rights. . . .*" (*Id.* § 3.10, emphasis supplied.)  The agreement further stated:

> Notwithstanding anything to the contrary in this Agreement, Seller makes no representations regarding whether the Assets or their past or future use or exploitation infringed or infringes on the Intellectual Property rights of any person . . . provided, however, that *Buyer hereby acknowledges that the foregoing representation shall not be deemed or construed as a basis for determining its actual or intended use or exploitation or the appropriateness or legality thereof.*

(Weiner Decl. Exh. 2, Purchase Agreement between Norton, LLC and Bill Graham Enterprises, Inc. for all the membership interests of Bill Graham Archives, LLC at § 3.11(a), emphasis supplied.)

[7]  Fourteen Acquisition Agreements were offered in connection with the instant motion though it appears, on account of the revision of the class definition to exclude recordings made in a studio, at least one of those agreements (*i.e.,* King Biscuit Flower Hour) is no longer at issue.

[8]  The agreement covering the Great American Music Hall (GAMH) recordings (Sagan Decl., Exh D. Bradshaw) diverged from the standard agreement by including additional language regarding GAMH's ownership and limitations on commercial release during the performer's lifetime:

United States District Court
Northern District of California

In total, defendants acquired over 21,000 audio and audiovisual recordings, some of which included multiple songs (or musical works). (Sagan Depo. at 143:1-13.) Defendants copied the recordings onto hard drives and servers, sometimes mixing or mastering the files depending on their condition, and then created mp3 file copies of them. (Sagan Decl. ¶¶ 29, 30.)

In 2006, defendants began offering copies of the recordings to the public on their Websites for digital download or on-demand streaming, by individual sale or on a subscription basis. (*Id.* ¶¶ 30, 31.) In 2009, following litigation defendants brought by several record companies and musicians alleging unauthorized exploitation of the recordings via the Websites, defendants entered into settlement agreements with three major record labels: UMG Recordings Inc., Warner Music, Inc., and Sony Music Entertainment. (Sagan Decl. N, O, P ["Joint Exploitation Agreements"].)[9] The Joint Exploitation Agreements state that defendants own the copyright in the "master" recordings covered therein.[10]

---

Any and all performers whose performance is captured in the GAMH Recordings were fully aware of, and approved of and consented to, the making of the GAMH Recordings under the following terms: (i) Seller would have ownership of the GAMH Recordings (with Seller having the right to sell or transfer such recordings); (ii) *During the performer's lifetime*, the recorded performance could be released commercially by Seller or his assigns *upon the approval of the performer*; and (iii) *After the performer's lifetime*, the recorded performance could be released commercially by Seller or his assigns subject *only to the condition that an artist's royalty would be paid to the performer's estate*, assigns or heirs at a commercially reasonable rate relative to recording industry standards . . . .

(Sagan Decl., Exh. D at § 4(e), emphasis supplied.)

[9] Defendants also entered into individual settlement agreements with certain performers including Van Morrison, the Grateful Dead and Carlos Santana. (*See* Sagan Decl. ¶¶ 22-25.) Depending upon the releases in their settlement agreements, some individuals may be precluded from litigating the claims alleged in this action. The particular terms of those agreements are not otherwise necessary to the class certification determination here and therefore may remain under seal in their entirety.

[10] The Court notes the following terms of the Exploitation Agreements: (1) none of the agreements purports to transfer any rights or grant any license with respect to audiovisual recordings, only sound recordings (Warner Agreement at ¶ 3.6(f); Sony Agreement ¶¶ 8.1, 8.2, 10.3; UMG Agreement at Recitals [rights to "sound recordings"]); (2) the Sony and Warner agreements expressly exclude rights with respect to exploitation of the *compositions* captured in the recordings (*see* Sony Agreement at ¶¶ 4.4(a); Warner Agreement ¶¶ 8.1, 8.2); and (3) the UMG agreement purports to transfer UMG's compulsory license with respect to distribution rights for certain musical compositions, but otherwise does not claim to cover rights related to musical compositions (UMG at ¶ 3.1).

In the present litigation, Kihn declares that the recordings of his live performances available on the Websites were made and exploited without his permission, and that he was not aware the performances were recorded and archived for later exploitation. (Kihn Decl., Dkt. No. 107-3, ¶ 3). Joel Turtle, co-owner of Rye Boy Music, LLC, likewise avers that Rye Boy did not consent to the exploitation of its compositions through the recordings trafficked on defendants' Websites. (Turtle Decl. Dkt. No. 107-4, ¶ 8.)[11]

## III.    DISCUSSION

A class action lawsuit is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki,* 442 U.S. 682, 700–01 (1979). To depart from this general rule, "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *East Tex. Motor Freight Sys., Inc. v. Rodriguez,* 431 U.S. 395, 403 (1977) (internal quotations and citation omitted). The proponent of class treatment, usually the plaintiff, bears the burden of demonstrating that class certification is appropriate. *True Health*, 896 F.3d at 931 (citing *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979-80 (9th Cir. 2011). Federal Rule of Civil Procedure 23, which governs class certification, has two distinct sets of requirements that plaintiffs must meet before the Court may certify a class. Plaintiffs must meet all requirements of Rule 23(a) and must satisfy at least one prong of Rule 23(b), depending upon the nature of the class they seek to certify. *See also Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co*., 559 U.S. 393, 394 (2010) (setting forth requirements of Rule 23). Within the framework of Rule 23, the Court ultimately has broad discretion over whether to certify a class. *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir.) *opinion amended on denial of reh'g,* 273 F.3d 1266 (9th Cir. 2001).

Plaintiffs seek to certify two separate classes alleging separate, but related claims for relief. Rye Boy, as representative of the Composer Class, alleges two claims for copyright infringement

---

[11] Defendants represent that certain recordings of Kihn's performances would be covered by the Sony Agreement. (Sagan Decl. ¶ 18 ["Sony Music Entertainment acquired EMI's publishing catalog in approximately 2012, and therefore recordings by Greg Kihn are governed by this agreement."].)

based upon unauthorized sale and distribution on defendants' Websites of reproductions of their copyrighted compositions: (1) within audio recordings; and (2) within video concert footage. Kihn, for himself and on behalf of the proposed Performer Class, asserts a claim for violation of section 1101 of the Copyright Act, sometimes called the "Anti-Bootlegging Act." 17 U.S.C. § 1101. The Court first analyzes the Rule 23(a) factors for both putative classes given the substantial overlap in the factual issues relative to those preliminary issues. The Court then turns to an examination of the Rule 23(b) factors for each proposed class separately, taking into account the differences between the claims asserted.

### A. Rule 23(a) Factors

Under Rule 23(a), the Court may certify a class only where:

(1) the class is so numerous that joinder of all members is impracticable;
(2) there are questions of law or fact common to the class;
(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Courts refer to these four requirements as "numerosity, commonality, typicality[,] and adequacy of representation." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012). Although some inquiry into the substance of a case may be necessary to determine whether the requirements are satisfied, a court must not advance a decision on the merits to the class certification stage. The court's class-certification analysis must be "rigorous" and may "entail some overlap with the merits" of the underlying claims." *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 568 U.S. 455, 465–66 (2013) (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 and n.6 (2011)). "Merits questions may be considered to the extent — but only to the extent —that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen*, 568 U.S. 465-66.

### 1. Numerosity

Rule 23(a)(1) requires that a class be so numerous that joinder of all class members is "impracticable." Fed. R. Civ. P. 23(a)(1). The number of performers and musical works in the recordings on defendants' Websites undisputedly numbers in the hundreds, if not thousands.

Defendants argue that the actual number of class members is speculative and that plaintiffs have offered no way in which to identify the composers and performers. These arguments concern ascertainability of class members, not whether they are sufficiently numerous.[12]

Defendants also argue that numerosity cannot be shown because plaintiffs offer no evidence about the number of putative class members who consider defendants' exploitation of the recordings unauthorized or would be willing to participate in the lawsuit. Defendants offer no authority to suggest that putative class members' "willingness" to participate in the class action or belief in the merits of the claims are relevant criteria in the Court's analysis. Likewise, defendants do not offer evidence to suggest that a large proportion of putative class members would opt out of the litigation.[13] In the absence of any such authority or evidence, the argument is without merit.

The Court concludes that both of the proposed classes would be so numerous as to make joinder impracticable, satisfying Rule 23(a)(1).

### 2. Commonality

Rule 23(a)(2) requires the party seeking certification to show that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). To satisfy this requirement, the common question "must be of such a nature that it is capable of class[-]wide resolution – which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke." *Dukes*, 564 U.S. at 350. "[F]or purposes of Rule 23(a)(2), even a single common question will do." *Id.* at 359.

Rye Boy and the members of the Composer Class allege copyright infringement. Kihn and the members of the Performer Class allege that defendants trafficked in unauthorized recordings of their live musical performances. The claims all arise from the same actions: defendants' sale and

---

[12] Ascertainability is not a Rule 23 requirement but is subsumed under considerations of class manageability. *See Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1123 (9th Cir. 2017). The Court is not persuaded that identification of class members from recordings on the Websites would prove particularly difficult or unmanageable.

[13] Evidence that putative class members may be unwilling to bring their own claims on account of "their financial resources, the size of the claims, and their fear of retaliation in light of an ongoing relationship with the defendant" weighs in *favor* of certification. *See Twegbe v. Pharmaca Integrative Pharmacy, Inc.*, No. CV 12-5080 CRB, 2013 WL 3802807, at *2 (N.D. Cal. July 17, 2013); *Greko v. Diesel U.S.A., Inc.*, 277 F.R.D. 419, 425 (N.D.Cal.2011).

distribution of audio and audiovisual recordings of live performances on their Websites. In defense of the claims, defendants rely on the same set of agreements with substantially the same key terms to assert that they had owned the copyrights in the master recordings and acquired all necessary licenses for any use of the works. As in the copyright infringement class action in *Napster*, this shared factual predicate gives rise to at least some common questions for each proposed class. *In re Napster, Inc. Copyright Litig.*, No. 04-cv-1671-MHP, 2005 WL 1287611, at *7 (N.D. Cal. June 1, 2005) ("while it is true that proof of ownership, registration, and actual damages ultimately requires a work-by-work inquiry, viewing these determinations as purely "individual issues" ignores the fact that the claims of every member of the class are uniformly premised upon the uploading or downloading of a copyrighted work by Napster users"). Thus, the Court concludes that the relatively low bar of commonality under Rule 23(a)(2) is met for both proposed classes here.

### 3. Typicality

Rule 23(a)(3) requires a showing that the "claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality means that the named plaintiffs "suffer the same injury as the class members." *Dukes*, 564 U.S. at 348. "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (*quoting Hanon v. Dataproducts Corp.,* 976 F.2d 497, 508 (9th Cir.1992)). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Id.* (internal quotation marks omitted). The requirement is "permissive" and the representative's claims need only be "reasonably co-extensive with those of absent class members." *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (quoting *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1020 (9th Cir.1998)).

Rye Boy and Kihn contend that their claims are "reasonably coextensive with" those of their respective classes because they suffer the same injuries as the proposed class members,

arising from exploitation of their recordings on defendants' Websites. Arguing against typicality, defendants do not dispute that Kihn's and Rye Boy's claims are co-extensive with those of the classes they seek to represent, but rather that they each are subject to unique defenses. More specifically, defendants contend that, in 2010 and 2011, Kihn recorded songs at defendants' facilities, promoted defendants' business, and licensed certain recordings from them, and therefore must have been aware of defendants' exploitation of the recordings well before bringing this complaint. Because Rye Boy co-owner Joel Turtle is Kihn's manager, defendants further contend that Rye Boy personally benefitted from Kihn's conduct. Based on these assertions, defendants argue that the named plaintiffs' claims are subject to defenses unique to them based upon the statute of limitations, implied license, estoppel, and unclean hands.

"Defenses unique to a class representative counsel against class certification only where they 'threaten to become the focus of the litigation.'" *Rodriguez*, 591 F.3d at 1124 (citing *Hanon*, 976 F.2d at 508). Here, the Court does not reach the merits of the defenses,[14] but finds that defendants have not demonstrated the affirmative defenses particular to the Kihn and Rye Boy would threaten to become a focus of the litigation and defeat class treatment. *Cf. Torres*, 835 F.3d at 1142 (affirming finding that typicality was shown despite evidence of some factual differences between representatives and the class where defendant failed to indicate how those differences would "preoccupy" named plaintiffs). Simply asserting an affirmative defense, without more, does not undermine typicality. Both the facts and the legal viability of these affirmative defenses would require more development before the Court could conclude that they "threaten to become the focus of the litigation." *Cf. Sirius XM*, 2015 WL 4776932, at *12–14 (rejecting implied license, waiver, and estoppel defenses where defendant never actually sought out or relied upon

---

[14] For instance, whether Kihn and/or Rye Boy were aware of recordings available on defendants' Websites and delayed bringing suit has no bearing on the statute of limitations for copyright infringement, which runs from *each act of infringement,* which infringement plaintiffs allege continues to the present. Thus, copyright owners can defer suit until they "can estimate whether litigation is worth the candle." *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 682-83 (2014) ("It is hardly incumbent on copyright owners . . . to challenge each and every actionable infringement. And there is nothing untoward about waiting to see whether an infringer's exploitation undercuts the value of the copyrighted work, has no effect on the original work, or even complements it.")

them as part of their decision-making process).[15]

Defendants rely on *Estate of Berlin v. Stash Records, Inc.*, No. 95 CIV. 6575 PKL, 1996 WL 374176, at *2 (S.D.N.Y. July 2, 1996) for the proposition that the facts needed to determine claims of copyright infringement are so individualized that typicality rarely could not be satisfied. *Estate of Berlin*, which alleged a scheme by a record company to exploit musical works without obtaining a license for their use, is distinguishable. The circumstances in *Estate of Berlin* occurred in a pre-Internet world in which the alleged infringing conduct by defendants was "special and unique to [the] named plaintiff," and each putative class member would have to show "what activities defendants engaged in which violated its particular copyright." *Id.* Here, by contrast, the facts in support of plaintiffs' and the putative classes' claims are essentially the same: defendants offer audio and audiovisual recordings on their Websites—*i.e.*, the same "conduct" on the same Internet shop—which include musical performances and musical works of the named plaintiffs and members of the putative classes. Further, defendants rely on the same set of agreements in claiming they are authorized to do so as to all members of both classes.

Thus, the Court finds that Kihn's and Rye Boy's claims are typical of the classes they seek to represent, and Rule 23(a)(3) is satisfied.

### 4.    Adequacy

Rule 23(a)(4)'s adequacy requirement considers whether a class representative will "fairly and adequately protect the interests of the class," meaning that the representative does not have any conflicts of interest with other class members and will prosecute the action vigorously on their behalf. Fed. R. Civ. P. 23(a)(4); *see Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011). Defendants argue that Kihn, Rye Boy, and class counsel cannot adequately and fairly protect the interests of the proposed class because: Kihn and Rye Boy do not have a sufficient understanding of their claims; and counsel have no experience prosecuting copyright claims as class actions.

As to Kihn's and Rye Boy's purported lack of knowledge, defendants' arguments are

---

[15] Defendants do not specify the basis for their unclean hands argument. Likewise, defendants offer no facts or authority to suggest a fair use defense (section 107) would apply here.

United States District Court
Northern District of California

insubstantial. Both named plaintiffs here knew the essential allegations of the complaint.

Adequacy does not require that class representatives have intricate understanding of the law

applicable to their claims. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011).

Adequate representatives need only have "sufficient understanding of the legal claims against

defendant and need not be fluent with the technical legal issues in order to adequately represent

the class." *Akaosugi v. Benihana Nat. Corp.*, No. C 11-01272 WHA, 2012 WL 1657099, at *4

(N.D. Cal. May 10, 2012). Defendants have not shown that Kihn and Rye Boy are "startlingly

unfamiliar" with the facts and theories at issue in this action. *See Californians for Disability

Rights, Inc. v. California Dep't of Transp.*, 249 F.R.D. 334, 349 (N.D. Cal. 2008) ("a party must

be familiar with the basic elements of her claim, and will be deemed inadequate only if she is

'startlingly unfamiliar' with the case.") (internal citation omitted).[16]

Defendants next argue that plaintiffs' counsel have no experience prosecuting copyright

claims as class actions. The Court finds this argument unpersuasive. Counsel's declarations

demonstrate significant experience litigating class actions, including in copyright-related matters.

That copyright class actions have not been brought in large numbers previously, by this counsel or

others, does not reflect inexperience or inadequacy in litigating this class action.

Plaintiffs have met Rule 23(a)(4)'s requirement to show that Kihn, Rye Boy, and class

counsel will represent the proposed classes adequately.

### B. Rule 23(b) Factors

The Court next turns to an examination of the Rule 23(b) factors. Here, Kihn and Rye Boy

seek certification under both Rule 23(b)(3) and (b)(2). Because many of the issues in the Rule

---

[16] The cases cited by defendants on the adequacy issue are inapposite, since they concerned more than mere unfamiliarity with the claims. *See Simon v. Ashworth, Inc.*, No. CV071324GHKAJWX, 2007 WL 4811932, *2 (C.D. Cal. Sept. 28, 2007) (plaintiff not only unfamiliar with the nature of the claims, the relief sought, and his role as class representative, but also had a potential conflict of interest with the class and a familial relationship with counsel); *Sanchez v. Wal Mart Stores, Inc.*, No. CIV 206CV02573JAMKJM, 2009 WL 1514435, at *3 (E.D. Cal. May 28, 2009) (class representative inadequate where she was unknowledgeable and had a conflict of interest with the class due to limiting the remedies she sought on behalf of the class); *Tria v. Innovation Ventures, LLC*, No. CV 11-7135-GW(PJWX), 2013 WL 12324181, at *7 (C.D. Cal. Feb. 25, 2013) (court express concerns about both plaintiff's familiarity and her apparent conflict with the class "in terms of protecting her own individual interests in a way that may wind up penalizing the class").

23(b)(2) inquiry are subsumed within the more searching Rule 23(b)(3) inquiry, the Court focuses first on the latter.

Rule 23(b)(3) requires a plaintiff to establish "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). A finding of predominance requires that the proposed classes are "sufficiently cohesive to warrant adjudication by representation." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). "When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" *Tyson Foods, Inc. v. Bouaphakeo*, __ U.S. __, 136 S.Ct. 1036, 1045 (2016) (quoting 7AA C. Wright, A. Miller, & M. Kane, FEDERAL PRACTICE AND PROCEDURE § 1778, pp. 123–124 (3d ed. 2005)). The requirement is satisfied where a "common nucleus of facts and potential legal remedies dominates" the matters to be decided in the case. *Hanlon*, 150 F.3d at 1022. "[M]ore important questions apt to drive the resolution of the litigation are given more weight in the predominance analysis over individualized questions which are of considerably less significance to the claims of the class." *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016).

Because the claims brought by the Composer Class and Performer Class differ in significant ways, the Court examines the predominance of common questions for purposes of Rule 23(b)(3) separately for each class.

### 1. *Composer Class*

#### a. *Legal Framework for Copyright Infringement Claim*

Under the Copyright Act, the rights to a work vest initially in the author or authors of the work. 17 U.S.C. § 201(a). Copyright protection arises from the moment the work is "fixed in any tangible medium of expression." 17 U.S.C. § 102(a). As relevant here, the Copyright Act protects: (1) "musical works," *i.e.*, written musical compositions including any accompanying lyrics; (2) audiovisual works, and (3) "sound recordings." 17 U.S.C. § 102(a)(2), (6), (7). The

United States District Court
Northern District of California

Copyright Act provides owners of copyrighted works with the following exclusive rights:

> (1) to reproduce the copyrighted work in copies or phonorecords;
> (2) to prepare derivative works based upon the copyrighted work;
> (3) to distribute copies or phonorecords of the copyrighted work to the public by
> sale or other transfer of ownership, or by rental, lease, or lending;
> (4) [in the case of musical and audiovisual works] to perform the copyrighted
> work publicly;
> (5) [in the case of musical and audiovisual works] to display the copyrighted
> work publicly; and
> (6) in the case of sound recordings, to perform the copyrighted work publicly by
> means of a digital audio transmission.

17 U.S.C. § 106.[17]  For example, the owner of a copyright in a musical work (*i.e.,* a song's words

and musical composition) has the exclusive right to reproduce that musical work by making copies

(*e.g.*, in the form of record albums or mp3s for digital download) and selling those copies to the

public.  17 U.S.C. § 106 (1), (3).

      "Anyone who violates any of the exclusive rights of the copyright owner . . . is an infringer

---

[17] Section 101 defines "audiovisual works," "copies," "fixed," and "phonorecords" as
follows:

> "Audiovisual works" are works that consist of a series of related
> images. . . together with accompanying sounds, if any, regardless of the nature of
> the material objects, such as films or tapes, in which the works are embodied.
>             ***
> "Copies" are material objects, other than phonorecords, in which a work is fixed
> by any method now known or later developed, and from which the work can be
> perceived, reproduced, or otherwise communicated, either directly or with the aid
> of a machine or device. The term "copies" includes the material object, other than
> a phonorecord, in which the work is first fixed.
>             ***
> A work is "fixed" in a tangible medium of expression when its embodiment in a
> copy or phonorecord, by or under the authority of the author, is sufficiently
> permanent or stable to permit it to be perceived, reproduced, or otherwise
> communicated for a period of more than transitory duration.
>             ***
> "Phonorecords" are material objects in which sounds, other than those
> accompanying a motion picture or other audiovisual work, are fixed by any
> method now known or later developed, and from which the sounds can be
> perceived, reproduced, or otherwise communicated, either directly or with the aid
> of a machine or device.  The term "phonorecords" includes the material object in
> which the sounds are first fixed.

17 U.S.C. § 101.

of the copyright." 17 U.S.C. § 501. A claim of copyright infringement requires that a plaintiff show: (1) ownership of a valid copyright; and (2) defendant's violation of at least one of the exclusive rights conferred by the Copyright Act. *Adobe Sys. Inc. v. Christenson*, 809 F.3d 1071, 1076 (9th Cir. 2015). Once the alleged infringing acts are established by the plaintiff, the burden shifts to the defendant to establish any mitigating defense such as license, fair use, or consent. *See id.* at 1078-79 (party asserting first sale defense to avoid copyright infringement claim has burden to establish that affirmative defense); *Campbell v. Acuff–Rose Music, Inc.,* 510 U.S. 569, 590–94 & n. 20 (1994) (defendant bore the burden on fair use defense to copyright infringement); *Columbia Pictures Indus., Inc. v. Fung,* 710 F.3d 1020, 1039 (9th Cir. 2013) (Digital Millennium Copyright Act safe harbor is an affirmative defense on which defendant has the burden of establishing its requirements); *Rano v. Sipa Press, Inc.,* 987 F.2d 580, 585 (9th Cir. 1993) (defendant may assert license as an affirmative defense to a claim of copyright infringement).

Generally, if a third party wants to use the copyrighted work in some way that implicates the copyright owners' exclusive rights, the third party must obtain permission to do so by obtaining a license. The parties may negotiate a license which allows the third party to use the copyrighted work in a particular way in exchange for royalty payments. *See, e.g., Mills Music, Inc. v. Snyder*, 469 U.S. 153, 158 (1985) (record companies who contracted for license to use copyrighted composition "Who's Sorry Now" in making their own derivative works recorded by different artists were contractually obligated to pay royalties to copyright owner).

If copyrights are infringed, a copyright owner may seek damages and profits, or payment of statutory penalties "in a sum of not less than $750 or more than $30,000 as the court considers just" for each infringement of each work. 17 U.S.C. § 504(b). In addition, the infringer is subject to an injunction, as well as impoundment and destruction of any infringing items. 17 U.S.C. §§ 502, 503; *see also Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 433–34 (1984) ("the Copyright Act provides the owner of a copyright with a potent arsenal of remedies against an infringer of his work").

       *b.*    *Common Questions as to Composer Class Prima Facie Elements*

With respect to the first element of the Composer Class's *prima facie* showing for

copyright infringement claims, proof of the class members' ownership of the copyrights to the compositions may be established readily from the records of the Copyright Office. "[T]he necessity of making individualized factual determinations does not defeat class certification if those determinations are susceptible to generalized proof like [business] records." *See Minns v. Advanced Clinical Employment Staffing LLC*, No. 13-CV-03249-SI, 2015 WL 3491505, at *8 (N.D. Cal. June 2, 2015) (*citing* NEWBERG ON CLASS ACTIONS § 4:50 (5th ed.) ["common issues predominate when 'individual factual determinations can be accomplished using computer records, clerical assistance, and objective criteria—thus rendering unnecessary an evidentiary hearing on each claim'"]). Copyright registration is a prerequisite to bringing suit for infringement, and identification of the owners of the registered compositions can be accomplished simply by comparing the catalog of recordings offered by defendants with the Copyright Office records. *See* 17 U.S.C. § 411(a) (registration or preregistration required prior to litigation); *see also Petrella*, *supra*, 572 U.S. at 684 ("Although registration is 'permissive,' both the certificate and the original work must be on file with the Copyright Office before a copyright owner can sue for infringement.") (citing 17 U.S.C. §§ 408(b), 411(a)). As necessary, ownership can further be substantiated by the third-party licensing rights agencies who administer and manage licensing for music publishers (*i.e.*, Harry Fox Agency, Rightsflow, Inc., and MediaNet). (*See* Sagan Decl. ¶¶ 43-45.)[18] To the extent there might be some individual questions concerning ownership of the compositions, those questions appear to be marginal and to pertain mostly to ascertainability or manageability issues and do not undermine overall commonality. Consequently, the Court finds that the ownership element is susceptible to common proof.

Likewise, on the second element of the copyright infringement claims, the fact of defendants' exploitation of the compositions can be determined from one source for the whole class: defendants' own database of the recordings it has offered for sale or distribution. The universe of the audio and audiovisual recordings on defendants' Website during the class period

---

[18] Indeed, defendants themselves concede that they relied on paying these licensing rights agencies the requisite payments so that they could exploit the musical compositions at issue lawfully, undermining their argument that those centralized records cannot be used to determine ownership of the copyright in the musical works. (*See* Sagan Decl. ¶¶ 43-45.)

17

can be determined from defendants' own records, and the method by which ownership can be proven does not vary by class member.[19]

Once these *prima facie* elements of copyright infringement are established, the burden of proof shifts to defendants to establish a defense to copyright infringement. *See Adobe*, 809 F.3d at 1078-79.

### c. Common Questions as to Affirmative Defense of License

While plaintiffs retain the burden of establishing that a proposed class satisfies Rule 23, when affirmative defenses are a significant part of the proof on a claim, the court assesses predominance by analyzing those defenses the defendant "has actually advanced and for which it has presented evidence." *True Health*, 896 F.3d at 931–32. Such evidence may "allow [the plaintiff] to satisfy the predominance requirement of Rule 23(b)(3) with respect to those defenses." *Id.* at 932; *accord McCurley v. Royal Seas Cruises Inc.*, 331 F.R.D. 142, 173 (S.D. Cal. 2019). The proposed evidence defendants offer to prove their affirmative defenses may "strongly affect" the certification analysis, particularly when the "supporting evidence may be sufficiently similar or overlapping to allow [plaintiff] to satisfy the predominance requirement of Rule 23(b)(3) with respect to those defenses." *True Health*, 896 F.3d at 931, 932.

Here, defendants claim that they have all the necessary licenses to exploit the recordings and have complied with all licensing and royalty payment requirements, and therefore have no liability to the Composer Class. (*See* Oppo. at 6:22-7:3, 8:12-16 [defendants "have properly acquired and paid [p]laintiffs pursuant to mechanical licenses for any use of the works at issue in this case"; *see also* Sagan Decl. ¶¶ 37-40, 42-45.) Mr. Turtle, on behalf of plaintiff Rye Boy, disagrees stating that Rye Boy never gave permission to have its works exploited by defendants in

---

[19] Contrary to defendants' arguments, class certification has been found appropriate in the copyright context. *See In re Napster, Inc. Copyright Litig.*, No. 00-MDL-1369, 2005 WL 1287611, at *7 (N.D. Cal. June 1, 2005) (fact that the claims of every member of the class were premised upon unlawful uploading and downloading of a copyrighted work was "sufficiently 'significant' to warrant adjudication of the parties' dispute on a representative rather than individual basis" even in the face of potential individual, work-by-work questions of proof of ownership, registration, and actual damages); *Peer Int'l Corp. v. Pausa Records, Inc.*, 909 F.2d 1332, 1333 (9th Cir. 1990) (copyright infringement class action brought by owners of copyrights in nondramatic musical compositions against defendant record company for failure to comply with compulsory licensing provisions under 17 U.S.C. § 115).

these recordings, and was not aware they were being recorded and archived at all much less for later sale. (Turtle Decl., Dkt. No. 107-4, ¶ 8.)

Generally, a license to use a copyrighted work, like a transfer of ownership in such a work, must be in writing. 17 U.S.C. § 204(a); *see also Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 557 (9th Cir. 1990) (requirement that transfer of copyright ownership be in writing "ensures that the creator of a work will not give away his copyright inadvertently and forces a party who wants to use the copyrighted work to negotiate with the creator" to avoid ambiguity).[20] Under a special provision of the Copyright Act, a party may obtain a compulsory [or "mechanical"] license for use of "non-dramatic musical works" like those at issue here. 17 U.S.C. § 115. Section 115 creates an automatic license to use a composition, so long as statutory royalties are paid, in two situations: (1) making one's own recording of the composition; and (2) making a duplicate of someone else's recording of the composition. 17 U.S.C. § 115(a). With respect to the latter, section 115 states that:

> A person may not obtain a compulsory license for the use of the [musical] work in the making of phonorecords duplicating a sound recording fixed by another . . . unless--

---

[20] Defendants also assert implied license as an affirmative defense. A "narrow exception" to the writing requirement allows a non-exclusive license to be established by implication when the "'totality of the parties' conduct indicates an intent to grant such permission." *Michaels v. Internet Entm't Grp., Inc.*, 5 F.Supp.2d 823, 831 (C.D. Cal. 1998) (quoting 3 *Nimmer on Copyright* § 10.03[A][7], at 10–43 (1997)); *see also Effects Associates,* 908 F.2d at 558 (non-exclusive license implied when copyright holder "created a work at defendant's request and handed it over, intending that defendant copy and distribute it"). Thus, in *Effects Associates*, the copyright owner of certain special effects film footage was held to have granted a filmmaker an implied, non-exclusive license to use the footage, since the special effects company had created the footage at the filmmaker's request and provided it to him for use in a film. *Id.* That the filmmaker had only paid half the promised amount for the footage was a matter of contract law, not copyright infringement. *Id.* at 559.

However, rights under a license, even one that is compulsory under Section 115 or implied, cannot be transferred to another party absent the express authorization of the copyright holder. *See Harris v. Emus Records Corp.*, 734 F.2d 1329, 1334 (9th Cir. 1984) (for purposes of bankruptcy law, "a copyright license cannot be transferred by the licensee without authorization . . . [a]lthough defendants obtained the master tapes, they did not thereby obtain a license to mechanically reproduce them"); *Michaels*, 5 F.Supp.2d at 831 (alleged holder of an oral non-exclusive license from copyright owner to exploit video footage could not transfer that license to another party absent explicit authorization from the copyright owner of the footage).

(i) such sound recording was fixed lawfully[21]; _**and**_
(ii) the making of the phonorecords was authorized by the owner of the copyright in the sound recording . . . .

17 U.S.C. § 115(a)(1)(B) (emphasis supplied).[22]

    With respect to the audiovisual recordings on the Websites, section 115's automatic mechanical license does not apply at all. In order to use a musical composition as part of an audiovisual work (*i.e.*, the "synchronization" of musical compositions with the content of audiovisual works), a person must obtain a "synchronization license" from the copyright holders of the musical composition. *Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 527 (9th Cir. 2008) (discussing synchronization license). Such licenses are voluntary and negotiated, not compulsory. *Id.*; *see also ABKCO Music, Inc. v. Stellar Records, Inc.,* 96 F.3d 60, 63 n. 4 (2d Cir.1996) ("A synchronization license is required if a copyrighted musical composition is to be used in 'timed-relation' or synchronization with an audiovisual work.")[23]

    Defendants bear the burden to establish the affirmative defense of license. *Adobe*, 809 F.3d at 1076; *Rano,* 987 F.2d at 585. The evidence defendants offer in this regard includes: (1) the dozen or so Acquisition Agreements, substantially identical in their relevant terms; (2) the three Exploitation Agreements with the major record labels, also substantially similar in their key terms;[24] and (3) a statement that they have paid royalties to the music publishing rights

---

    [21] Section 1101 of the Copyright Act, discussed further *infra*, provides that: "[a] sound recording is not lawfully fixed if that fixation constitutes either copyright infringement under federal law, or common law copyright infringement, unfair competition, or other violation of state law." 17 U.S.C. § 1101.

    [22] Section 115(a) and (b) set forth additional requirements for proving a compulsory license, including previous distribution under authority of the copyright owner, and filing a timely Notice of Intention to Obtain Compulsory License. Failure to comply with the statutory requirements, in the absence of a voluntary, negotiated license, renders the making and distribution of phonorecords actionable as acts of infringement of the musical work. *See* 17 U.S.C. § 115(b)(4).

    [23] Defendants do not distinguish this authority, but rather contend that Mr. Turtle "admitted" in his deposition that synchronization licenses are not required for live performances. Even assuming that Mr. Turtle so testified, his opinions are not relevant to issues of law.

    [24] As previously indicated, the Sony and Warner agreements exclude from their coverage any rights with respect to exploitation of the *compositions* captured in the recordings. (*See* Sony Agreement at ¶¶ 4.4(a); Warner Agreement ¶¶ 8.1, 8.2.), and the UMG agreement purports to transfer UMG's compulsory license with respect to distribution rights for certain musical compositions, but otherwise does not claim to cover rights related to musical compositions. (UMG

United States District Court
Northern District of California

organizations for exploitation of all compositions.  Whether this evidence would establish

defendants' affirmative defense is not a question before the Court at class certification.  What is

important here is that the Court can determine the meaning and legal effect of these agreements on

a classwide basis from this evidence "in a one stroke."  *Dukes*, 564 U.S. at 350.  Said differently,

defendants' license argument itself does not raise issues that would require individualized

determinations for the members of the Composer Class, but apparently applies to all members

thereof.  Accordingly, the path to determination of defendants' license defense weighs in favor of

finding a predominance of common issues.[25]

### d.    Common Questions as to Other Affirmative Defenses

Defendants raise additional affirmative defenses which they contend will require

individualized determinations and defeat predominance, including statute of limitations, fair use,

equitable estoppel, waiver, implied license.  Again, defendants bear the burden to establish such

defenses.  No evidence offered in connection with defendants' opposition suggests that such

defenses would break down into individual inquiries that would counsel against class treatment.[26]

Indeed, the statute of limitations issues appear capable of ready determination based on

information from defendants' business records showing the dates of defendants' exploitation of

the recordings.  *See Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 671, 77-79 (2014)

(each violation of the Copyright Act gives rise to a separate accrual for purposes of the three-year

---

at ¶ 3.1.)  Likewise, as noted above, the Exploitation Agreements do not purport to transfer any rights or grant any license with respect to *audiovisual* recordings.  (Warner Agreement at ¶ 3.6(f); Sony Agreement ¶¶ 8.1, 8.2, 10.3, UMG Agreement at Recitals at BGA_00000334 [rights to "sound recordings"].)

[25] Defendants contend they are the owners, or joint owners, of the copyrights in the sound recordings at issue, based on the "joint contributions" to the recordings made by the third parties from whom they acquired the collections of recordings (like sound engineers and concert promoters).  Defendants have not offered sufficient evidence for the Court to analyze the merits of this argument fully.  On this record, the argument does not warrant denial of class treatment.

[26] For example, defendants' fair use argument would require a showing that their use of the compositions was for such purposes as "criticism, comment, news reporting, teaching. . . scholarship, or research," in addition to other factors.  17 U.S.C. § 107.  While the Court makes no determination as to the applicability or merits of this defense, the possibility of it being raised as to individual composers or compositions within the class does not warrant denial of class certification.

21

United States District Court
Northern District of California

statute of limitations and laches cannot be invoked to bar a claim accruing within that period, even if plaintiff delayed significantly in bringing an infringement claim).

Further, the existence of a handful of potential class members who reached individual agreements with defendants prior to the litigation does not, by itself, defeat a determination that common issues predominate.  *See Nitsch v. Dreamworks Animation SKG Inc*., 315 F.R.D. 270, 313 (N.D. Cal. 2016) (class can be certified even if defendants have individualized defenses as to particular class members); *Herrera v. LCS Fin. Servs. Corp.*, 274 F.R.D. 666, 681 (N.D. Cal. 2011) (TEH) ("[t]he fact that some members of a putative class may have . . . released claims against a defendant does not bar class certification . . . potential individual questions do not negate the predominance of the common issue[s]"); *Barnes v. AT & T Pension Benefit Plan–Nonbargained Program*, 270 F.R.D. 488, 494 (N.D. Cal.2010), *modified by* 273 F.R.D. 562 (N.D.Cal.2011) ("potential existence of [affirmative] defenses against absent class members does not, standing alone" warrant denial of class certification).

In sum, the evidence before the Court on defendants' affirmative defenses supports a finding that common questions predominate as to the Composer Class.

> ### d.     Proof of Damages

Finally, defendants urge denial of class certification because damage determinations for Composer Class members would break down into individual valuations of each work and the calculation of royalty payments owed and plaintiffs have submitted no damages model or expert testimony on.

The Court does not find these arguments persuasive.  Damage calculations can be managed as part of a class action.  *See In re Napster*, 2005 WL 1287611, at *7–12; *see also Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 513 (9th Cir. 2013) (rejecting argument that individualized damages calculations preclude class certification).  Moreover, calculation of a statutory damage rate for the violations is straightforward.  *See* 17 U.S.C. § 504(c)(1).

With respect to damages for willful violations of the Copyright Act, plaintiffs offer

evidence that defendants knew they lacked the required consent to exploit the recordings.[27] The Court is inclined to find that willfulness may be capable of being established on a classwide basis. However, the Court reserves determination of this issue for a more fulsome factual and legal development. Resolution of the issue is not essential to whether common questions predominate.

### e. Conclusion

Based upon the foregoing, the Court **GRANTS** certification of the proposed Composer Class under Rule 23(b)(3).

### 2. Performer Class

Kihn, for himself and on behalf of the proposed Performer Class, does not allege copyright infringement but instead asserts violations of Section 1101 of the Copyright Act, sometimes called the "Anti-Bootlegging Act." 17 U.S.C. § 1101. In particular, Kihn claims he and proposed Performer class members presented live musical performances which were recorded and later acquired by defendants who reproduced, distributed, sold and trafficked in those recordings without their consent or authorization. (Complaint ¶¶ 53-57.)

In order for the Court to determine whether common issues predominate as to the Performer Class, the Court must consider the issues to be decided on a section 1101 claim, which party would bear the burden of proof on those issues, and the evidence presently before the Court as to whether the issues can be determined on a classwide basis. *See True Health*, *supra*, 896 F.3d at 931–32. As explained herein, a claim under section 1101 differs from a standard copyright infringement claim due to the nature of the conduct prohibited. The parties concede that section 1101 does not state, on its face, which party bears the burden to prove consent and authorization of

---

[27] *See* Weiner Decl., Exh. 22 at 17-18 [appraisal report done prior to Bill Graham Archive acquisition stating that "performer releases would still need to be secured in order to fully exploit this portion of the collection" and "no significant reuse can be contemplated without securing the customary clearances from the performers, publishers and possibly other parties."]; Exh. 23 at ¶ 20 [declaration of former Bill Graham employee stating the company did not exploit the archives "primarily due to concern regarding artists' rights (*e.g.*, if a concert was recorded, a question arises whether the Companies can exploit that recording financially without the artist's consent)"]; Exh. 20-21 [cease and desist letter regarding use of recording of Sonny Rollins as violation of performance contract].

United States District Court
Northern District of California

the performers, nor is there authority deciding that question.[28]  Thus, for the reasons set forth below, in deciding this novel question, the Court concludes that the burden should be allocated to defendants based upon the language of the statute, the interpretation of analogous sections in the Copyright Act, principles of evidence, and the policy underlying the federal copyright laws.

### a.  Background and Context of Section 1101

In 1971, Congress first extended copyright protection to "sound recordings" making them copyrightable "works of authorship."  *United States v. Moghadam*, 175 F.3d 1269, 1272 (11th Cir. 1999).  Section 101 was amended to define "sound recordings" as "works that *result from the fixation* of a series of musical, spoken, or other sounds, but not including the sounds accompanying a motion picture or other audiovisual work, regardless of the nature of the material objects, such as disks, tapes, or other phonorecords, in which they are embodied."  17 U.S.C. § 101.  As previously noted, a work is "*fixed* in a tangible medium of expression when its embodiment in a copy or phonorecord, *by or under the authority of the author*, is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration."  *Id.* (emphasis supplied).

Following the 1971 amendments to the Copyright Act, the sale of *unauthorized reproductions* of copyrighted sound recordings (*i.e.*, "piracy") was subject to criminal prosecution or civil liability as copyright infringement.  *Moghadam*, 175 F.3d at 1272.  However, the federal statutes offered no protection for *live* musical performances or *unauthorized recordings* of those performances.  *Id.*  Recordings not made "by or under the authority of the author," even if embodied in a disk, tape, or other medium, are not "fixed" for purposes of the copyright infringement statute, and not subject to a claim for copyright infringement.  *Flo & Eddie, Inc. v. Bill Graham Archives LLC*, No. 09-CV-2842 SVW (PJWX), 2009 WL 10671057, at *5 (C.D. Cal. Aug. 25, 2009).  As the district court explained in *Flo & Eddie*, a prior copyright case against defendant Bill Graham Archives:

---

[28]  By its order of November 20, 2019 (Dkt. No. 159), the Court specifically sought supplemental briefing on the question of the burden of proof as to consent and authorization of the performers in a section 1101 claim.  The parties were unable to provide direct authority as to which party would bear the burden of proof on that question, nor has the Court found any.

> Live performances . . . are not entitled to copyright protection unless they are transformed into copyrightable "sound recordings." In order to qualify for copyright protection, these "sound recordings" must be "original works of authorship fixed in any tangible medium of expression." 17 U.S.C. § 102(a).
>
> * * *
>
> Bootleggers[29] transform an uncopyrightable transitory musical performance into permanent recorded form. However, these unauthorized permanent recordings are not "fixed" for Copyright Act purposes. The musicians themselves are the "authors" of the work within the meaning set out in *Community for Creative Non-Violence* because they are the persons translating musical "idea[s]" into audible "expression[s]." Since bootleg recordings are by definition unauthorized by the author/musicians, such recordings cannot be "fixed" under § 101, and therefore cannot be given copyright protection.

*Flo & Eddie*, 2009 WL 10671057, at *5 (citing *Moghadam*, 175 F.3d at 1272, *United States v. Martignon*, 492 F.3d 140, 151 (2d Cir. 2005), and *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989)). Lack of coverage in the earlier federal copyright statutes allowed bootleggers to record a live musical performance surreptitiously and distribute unauthorized copies with impunity. *Moghadam*, 175 F.3d at 1271. "This gap in copyright protection, exacerbated by the growing market for such bootleg copies, motivated Congress to enact the anti-bootlegging provision." *Id.* at 1272.

Thus, in 1994, as part of comprehensive international trade legislation, Congress enacted

---

[29] The United States Supreme Court has described a "bootleg" recording as follows:

> A "bootleg" phonorecord is one which contains an unauthorized copy of a commercially unreleased performance. As in this case, the bootleg material may come from various sources. For example, fans may record concert performances, motion picture soundtracks, or television appearances. Outsiders may obtain copies of "outtakes," those portions of the tapes recorded in the studio but not included in the "master," that is, the final edited version slated for release after transcription to phonorecords or commercial tapes. Or bootleggers may gain possession of an "acetate," which is a phonorecord cut with a stylus rather than stamped, capable of being played only a few times before wearing out, and utilized to assess how a performance will likely sound on a phonorecord. [¶] Though the terms frequently are used interchangeably, a "bootleg" record is not the same as a "pirated" one, the latter being an unauthorized copy of a performance already commercially released.

*Dowling v. United States*, 473 U.S. 207, 211 n.2 (1985) (appeal from conviction for transportation of stolen property, conspiracy, copyright infringement, and mail fraud stemming from "extensive bootleg record operation involving the manufacture and distribution by mail of recordings of vocal performances by Elvis Presley"). The Court notes that *Dowling* well pre-dates the Internet and the advent of digital copying and duplication of recordings of the kind alleged here.

United States District Court
Northern District of California

section 1101 and its criminal counterpart (18 U.S.C. § 2319A) to address the problem of bootlegging. *Id.* (citing 140 Cong. Rec. H11441, H11457 (daily ed. Nov. 29, 1994) (statement of Rep. Hughes)).[30] Section 1101 provides:

> Anyone who, without the consent of the performer or performers involved—
>     (1) fixes the sounds or sounds and images of a live musical performance in a copy or phonorecord, or reproduces copies or phonorecords of such a performance from an unauthorized fixation,
>     (2) transmits or otherwise communicates to the public the sounds or sounds and images of a live musical performance, or
>     (3) distributes or offers to distribute, sells or offers to sell, rents or offers to rent, or traffics in any copy or phonorecord fixed as described in paragraph (1), regardless of whether the fixations occurred in the United States,
> shall be subject to the remedies provided in sections 502 through 505, to the same extent as an infringer of copyright.

17 U.S.C. § 1101(a). These "anti-bootlegging" protections are similar to copyright protections, but not identical. *See Flo & Eddie*, 2009 WL 10671057, at *5. While section 1101 provides copyright *remedies* to performers, it does not confer copyright *ownership* in the recordings either to the performers or to the persons who recorded the live performance. *Id.* at *6; *see also Martignon*, 492 F.3d at 151 (criminal counterpart to section 1101 "does not create and bestow property rights upon" performers but "creates a power in the government to protect the interest of performers from commercial predations" similar to the law of trespass).

### 2. Statutory Interpretation

Few decisions have considered the requirements of an anti-bootlegging claim under section

---

[30] As summarized by the Eleventh Circuit in *Moghadam*:

The anti-bootlegging statute grew out of the Agreement on Trade Related Aspects of Intellectual Property ("TRIPs") . . . [which] became law by operation of the Uruguay Round Agreements Act ("URAA"), Pub.L. No. 103–465, 108 Stat. 4809 (1994), a comprehensive act dealing with matters of international trade . . . . The URAA [enacted a criminal provision, 18 U.S.C. § 2319A, and] also enacted a similar provision establishing civil liability for the same conduct . . . . There is little legislative history dealing with either provision because the URAA was rushed through Congress on fast-track procedures.

*Moghadam*, 175 F.3d at 1272.

26

1101.[31]  Thus, the Court looks to principles of statutory interpretation to shed light on appropriate

allocation of the burdens of proof.  Generally, the plain language of a provision is conclusive

unless (1) the statutory language is unclear, (2) the plain meaning of the words is at variance with

the policy of the statute as a whole, or (3) a clearly expressed legislative intent exists contrary to

the language of the statute.  *Columbia Pictures Indus., Inc. v. Prof'l Real Estate Inv'rs, Inc.*, 866

F.2d 278, 280 n.4 (9th Cir. 1989) (*citing Richards v. United States,* 369 U.S. 1, 11 (1962)).  In

interpreting a statute, the court should not read any section in isolation but instead must "look to

the provisions of the whole law, and to its object and policy."  *Richards,* 369 U.S. at 11.  Further,

"provisions of a single act should be construed in as harmonious a fashion as possible."

*Massachusetts Museum of Contemporary Art Found., Inc. v. Buchel*, 593 F.3d 38, 51 (1st Cir.

2010) (internal citation omitted) (interpreting Visual Artists Rights Act amendments to Copyright

Act in accord with existing definitions in Section 101 to conclude that unfinished works of visual

art are protected); *accord Richards v. United States*, 369 U.S. 1, 11 (1962) (". . . in interpreting

legislation, we must not be guided by a single sentence or member of a sentence, but (should) look

to the provisions of the whole law, and to its object and policy," internal quotation omitted); *Boise

Cascade Corp. v. U.S. E.P.A.*, 942 F.2d 1427, 1432 (9th Cir. 1991) ("Under accepted canons of

statutory interpretation, we must interpret statutes as a whole, giving effect to each word and

making every effort not to interpret a provision in a manner that renders other provisions of the

same statute inconsistent, meaningless or superfluous.").

    "The normal rule of statutory construction assumes that identical words used in different

parts of the same act are intended to have the same meaning."  *Sorenson v. Secretary of Treasury,*

475 U.S. 851, 860 (1986) (internal quotation omitted).  Drawing from this principle, defendants

argue that section 1101 should be interpreted consistent with section 501, the copyright

---

[31]  The Court notes that district court's decision *ABKCO v. Sagan*, one of the only other
decisions to discuss Section 1101 (in a case concerning the exact same defendants, Websites, and
agreements at issue here) assumed that the burden to establish consent and authorization was on
defendants. *ABKCO Music, Inc. v. Sagan* ("*ABKCO v. Sagan II*"), No. 15 CIV. 4025 (ER), 2019
WL 1382074, at *3–4 (S.D.N.Y. Mar. 26, 2019) (". . . Defendants would need to show that the
recordings were made with 'the consent of the performer or performers involved'") (internal
citations omitted).  However, *ABKCO* did so in *dicta*, since no section 1101 was alleged.

United States District Court
Northern District of California

infringement statute, particularly since the preamble language in each section is similar. The Court agrees that the language of section 501, and the way in which that language has been interpreted with respect to the allocation of burdens in a copyright infringement action, provide a useful roadmap for understanding the burdens of proof for a section 1101 claim, though not reaching the same conclusions argued by defendants.

Section 501 reads, in pertinent part, "[a]nyone who violates any of the exclusive rights of the copyright owner *as provided by sections 106 through 122* . . . is an infringer of the copyright." 17 U.S.C. § 501(a) (emphasis supplied).[32] Section 106 enumerates the exclusive rights of a copyright owner, while sections 107 through 122 list exceptions to or qualifications of those exclusive rights, such as fair use (section 107), first sale (section 109), and compulsory license for musical works (section 115). *See, e.g.,* 17 U.S.C. § 106 ("[s]ubject to sections 107 through 122. . . ."). As the Ninth Circuit stated in *Adobe v. Christenson*, a violation of section 501 requires that the plaintiff establish: (1) ownership of a valid copyright; and (2) violation of at least one of the exclusive rights in section 106. *Adobe*, 809 F.3d 1071, 1076 (9th Cir. 2015); *see also UMG Recordings, Inc. v. Augusto*, 628 F.3d 1175, 1178 (9th Cir. 2011) (same); *A&M Records v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001) (same).[33] The burden then shifts to the party seeking to avoid liability to establish some excuse from or defense to liability. *Id*. at 1078-79. Thus, although section 501 does not so specify, courts consistently have determined that the applicability of any of the exceptions in sections 107 to 122 must be proven by the *defendant*

---

[32] The full text of the first sentence in 17 U.S.C. § 501(a) reads:

(a) Anyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 122 or of the author as provided in section 106A(a), or who imports copies or phonorecords into the United States in violation of section 602, is an infringer of the copyright or right of the author, as the case may be.

17 U.S.C. § 501.

[33] Defendants incorrectly argue that a claim under section 501 requires plaintiff to prove an additional element—that the alleged infringer's "copying was unauthorized"—citing *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 481 (9th Cir. 2000) abrogated on other grounds in *Skidmore as Tr. for Randy Craig Wolfe Tr. v. Zeppelin*, 952 F.3d 1051, 1066 (9th Cir. 2020). Neither *Three Boys* nor any other Ninth Circuit authority impose this additional element to establish a *prima facie* case of infringement under section 501.

raising such exception. *See id.* at 1078-79 (defendant bears the burden to establish first sale

exception under section 109(a)); *Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1153 (9th Cir.

2016) (regardless of whether "fair use" is characterized as an affirmative defense or an excuse

from liability, burden of proving fair use under section 107 is always on the putative infringer);

*Campbell v. Acuff–Rose Music, Inc.,* 510 U.S. 569, 590–94 & n. 20 (1994) (same).

In considering the appropriate allocation of burdens of proof under section 109(a)'s first

sale defense, the Ninth Circuit in *Adobe* relied on long-standing legal principle and precedent

holding that "fairness dictates that a litigant ought not have the burden of proof with respect to

facts particularly within the knowledge of the opposing party." *Adobe*, *supra*, 809 F.3d at 1079.

Thus, in *Adobe*, the court held that "the party asserting the first sale defense bears the initial

burden of satisfying the statutory requirements" of the defense, *i.e.*, lawful acquisition of a copy

through a sale. *Id.* at 1078-79. *Only if* the plaintiff then seeks to rebut defendant's showing does

the burden shift back to the plaintiff to establish, for instance, that defendant's copy was subject to

a license agreement. *Id.* Following from the general principle, the court held that the second

burden shift made sense because the "[t]he copyright holder is in a superior position to produce

documentation of any license and, without the burden shift, the first sale defense would require a

proponent to **prove a negative**, *i.e.,* that the [work] was **not** licensed." *Id.* (emphasis supplied).

Similarly, in a claim under section 1202(b) of the Digital Millennium Copyright Act,[34] the

Ninth Circuit held that the burden of proof should be on defendant to show whether embedded

---

[34] This provision of the DMCA states:

[n]o person shall, *without the authority of the copyright owner* or the law—
    (1) intentionally remove or alter any copyright management information,
    (2) distribute or import for distribution copyright management information
    knowing that the copyright management information has been removed or
    altered without authority of the copyright owner or the law, or
    (3) distribute, import for distribution, or publicly perform works, copies of
    works, or phonorecords, knowing that copyright management information
    has been removed or altered without authority of the copyright owner or
    the law

knowing, or . . . having reasonable grounds to know, that it will induce, enable,
facilitate, or conceal an infringement of any right under this title.
17 U.S.C. § 1202(b) (emphasis supplied).

copyright management information (CMI) was removed or altered without the copyright holder's authority. *Friedman v. Live Nation Merch., Inc.*, 833 F.3d 1180, 1189 (9th Cir. 2016). The Ninth Circuit held that the burden to show the copyright owner's authorization appropriately fell to the defendant since the question of how the defendant exploiting plaintiff's photographs "came to possess [plaintiff's] images—missing their CMI—in the first place" was a matter "particularly within" its knowledge. *Id.*

Other defenses or exceptions elsewhere in the Copyright Act or arising from common law all put the burden of proof on the party seeking to avoid punishment for infringement. *See Columbia Pictures Indus., Inc. v. Fung,* 710 F.3d 1020, 1039 (9th Cir. 2013) (Digital Millennium Copyright Act safe harbor in section 512 is an affirmative defense on which defendant has the burden); *Rano,* 987 F.2d at 585 (defendant may assert license as an affirmative defense to a claim of copyright infringement); *A&M Records*, *supra*, 239 F.3d at 1026 (waiver, implied license and copyright misuse are all affirmative defenses to a claim of copyright infringement on which the defendant bears the burden of proof). Moreover, the legislative history of the 1976 Copyright Act amendments indicates that "in an action [to] determine whether a defendant is entitled to the privilege established by section 109(a) and (b) [regarding re-sale or transfer of particular copies or phonorecords], the burden of proving whether a particular copy was lawfully made or acquired should rest on the defendant."[35]

---

[35] *See* 8 NIMMER ON COPYRIGHT Appx. 4, Section 109 (2019) (quoting House Report on the Copyright Act of 1976):

> [T]he Committee's attention was directed to a recent court decision holding that the plaintiff in an infringement action had the burden of establishing that the allegedly infringing copies in the defendant's possession were not lawfully made or acquired under section 27 of the present law. *American International Pictures, Inc. v. Foreman*, 400 F. Supp. 928 (S.D. Alabama 1975). The Committee believes that the court's decision, if followed, would place a virtually impossible burden on copyright owners. The decision is also inconsistent burden on copyright owners. The decision is also inconsistent with the established legal principle that the burden of proof should not be placed upon a litigant to establish facts particularly within the knowledge of his adversary. The defendant in such actions clearly has the particular knowledge of how possession of the particular copy was acquired, and should have the burden of providing this evidence to the court. It is the intent of the Committee, therefore, that in an action [to] determine whether a defendant is entitled to the privilege established by section 109(a) and (b), the burden of proving whether a particular copy was lawfully made or acquired should rest on the defendant.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Here, Kihn contends that the recordings on defendants' Websites are, in the terms of

2  section 1101, "unauthorized fixations" and that defendants have reproduced copies of those

3  unauthorized fixations.  *See* 17 U.S.C. § 1101(a)(1) (reproducing copies of live performance "from

4  an unauthorized fixation").  The Court finds the burden to establish that the recordings at issue

5  were authorized by the performers ought to be placed on the party asserting the recordings that

6  were authorized, *i.e.*, the defendants.  To hold otherwise would require plaintiffs to prove the

7  *negative*—that the recording defendants are exploiting (made by someone else who is not a party

8  here and perhaps unknown) was made and distributed *without* the consent and authorization of the

9  performers.

10    Thus, in a section 1101 claim for reproduction and trafficking in a bootleg recording, the

11  Court concludes that plaintiff bears the initial burden to show: (1) plaintiff is the performer who

12  appears in a recording of a live musical performance; (2) defendants reproduced or distributed the

13  recording of that live musical performance.  At that point, the burden shifts to the defendant

14  seeking to avoid liability to prove that the "fixation" of the recording was authorized by the

15  performers.[36]

16    Following from the principle of reading all sections of a statute in harmony, the Court

17  finds this to be the more harmonious reading, since it would allocate the burden of proving

18  authorization and consent under a section 1101 similarly to the burden or proving license in a

19  copyright infringement claim under section 501.  Were the Court to find otherwise, performer

20  plaintiffs would be required to prove the *absence* of their consent and authorization in a bootleg

21  recording claim, while the burden to establish license—essentially authorization—to use the

22  composition from the *same* defendant's exploitation of the *same* bootleg recording clearly would

23  be on the alleged infringer-defendant, thus resulting in an unfair disparity of burdens as between

24

25

26    ―――――――――――――――
    [36]  Defendants have argued that consent and authorization need not be express or written

27  but could be oral or implied.  (Oppo. at 15:11-13 and n.12.)  While the Court need not reach that
    legal question to resolve this motion, the argument underscores the propriety of putting the

28  evidentiary burden on the party asserting an oral or implied basis for finding authorization.

two contributors to the same exploited recording.[37]

Allocation of the burden to defendants is likewise consistent with the Copyright Act principle that copyright ownership "vests initially in the author" or creator of a work, 17 U.S.C. § 201(a), and that authors and creators are presumed to retain the exclusive right to control certain uses of those works. *See Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989) (copyright ownership presumed to vest in the party who actually creates the work); *see also,* 17 U.S.C. § 202 (in the absence of an agreement, transfer of a copy does not convey transfer of ownership copyright or any exclusive rights thereunder); *Am. Int'l Pictures, Inc. v. Foreman*, 576 F.2d 661, 665 (5th Cir. 1978) ("the person claiming authority to copy or vend generally must show that his authority to do so flows from the copyright holder," not from mere possession of a copy); *Harris*, *supra*, 734 F.2d at 1334 (purchase of master recordings does not transfer exclusive rights under Copyright Act absent evidence of authorization); *Forward v. Thorogood*, 985 F.2d 604, 605–06 (1st Cir. 1993) (where band permitted individual "to keep tapes solely for his personal enjoyment" without an agreement to to transfer copyright interest in the recordings captured thereon, ownership of tapes did not establish ownership of copyright). Doubts as to whether the creator gave up rights enumerated under the Copyright Act should be resolved in favor of the creator and only "[t]he clearest language [will] to divest the [creator] of the fruits of his labor." *Warner Bros. Pictures v. Columbia Broad. Sys.*, 216 F.2d 945, 949 (9th Cir. 1954); *see also Jim Henson Prods. v. John T. Brady & Assocs.*, 16 F.Supp.2d 259, 285 (S.D.N.Y. 1997) ("unless the author has given up his or her rights under copyright in a clear and unequivocal manner, he or she retains these rights").[38] For works enumerated in the copyright statutes, an author may obtain a

---

[37] Defendants' citation to *Willis v. Knight*, No. 1:08-CV-705-ODE, 2008 WL 11336133, at *6 (N.D. Ga. Oct. 20, 2008) is inapposite, given that the plaintiff there alleged that the recording was made with her consent and in collaboration with the defendant, such that section 1101 did not apply.

[38] Defendants contend that the Performer Class members "effectively transferred" whatever rights they had in the recordings, although it is unclear whether defendants mean transfer to a record label or to one of the sources from whom defendants acquired the recordings. Regardless, the Copyright Act requires transfer of ownership rights be made in writing, signed by the owner or owner's agent, and puts the burden of proof on the party asserting transfer. *See* 17 U.S.C. § 204.

copyright registration certificate to establish presumptive ownership over the rights to that work. However, by the nature of the recordings covered under section 1101, the "author" (*i.e.*, live music performer) of a bootlegged recording has no way to register the work and ensure a presumption of ownership over the recording.[39]

Moreover, putting the burden on the party exploiting the recording—a recording the performer may never have known was made or exploited until long after the performance—makes sense from the standpoint both of the general purposes of the Copyright Act and the purposes of section 1101 itself. *See* 3 NIMMER ON COPYRIGHT § 8E.02 (citing legislative history of URAA stating: "[t]he United States has led efforts to combat the rise in piracy of sound recordings in countries around the world. The new federal remedies will ensure that performers enjoy a high and uniform level of protection in the United States as well, and will aid efforts by the Customs Service to combat bootleg sound recordings.").[40]

In sum, based on the foregoing analysis, the Court concludes that section 1101 claimants need only establish that they are performers in the recording and that defendants exploited the recording by reproducing copies and trafficking in them. The burden then shifts to defendants to plead and establish that the recording was made, and copies reproduced, with effective consent and authorization of the performers.[41]

_____

[39] Defendants argue that if Congress intended claims regarding unauthorized trafficking of bootleg recordings to be treated identically to infringement of other copyrighted works, it would have added such recordings to the list of copyrighted works in section 106. Defendants' argument defies logic, since section 106 protects only works that are "fixed," *i.e.*, made "under the authority of the author." *See* 17 U.S.C. §§ 101, 102, 106. Bootlegged recordings are, by definition and nature, *not* "fixed" because they are not made under the authority of the performers, *i.e.*, the "author" of the work.

[40] The Court further notes that California's criminal bootlegging statute expressly states this same approach to the evidentiary burdens by providing a presumption that the performer owns the sounds of a live performance absent a writing to the contrary. Cal. Penal Code § 653u(b) ("In the absence of a written agreement or operation of law to the contrary, the performer or performers of the sounds of a live performance shall be presumed to own the right to record or master those sounds.")

[41] In their supplemental briefing, plaintiffs offer further analogy to the defendant's burden to prove express consent in a claim under the Telephone Consumer Protection Act (TCPA). *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1044 (9th Cir. 2017) ("Express consent is not an element of a plaintiff's prima facie case but is an affirmative defense for which the defendant bears the burden of proof."); *see also True Health*, 896 F.3d at 931, 933 (defendant's evidence of

33

### 3. *Effect on Class Certification*

Following from this conclusion, and based upon the record presently before it, the Court finds that the bootlegging claim can be determined on common evidence, such that common issues will predominate for the Performer Class's section 1101 claim. Determination of the prima facie elements—the performers in the recordings at issue, and defendants' exploitation of the recordings—can be made readily from defendants' business records regarding the Websites. The burden then shifts to defendants to establish that the recordings were made with consent and that defendants had valid authorization to exploit them. Further, the evidence presently before the Court indicates that the proof defendants would offer to meet their burden on the issue of authorization would apply classwide. Proof of authorization, as well as other affirmative defenses, would not create individualized questions that could undermine predominance. On these issues, defendants have indicated they will rely primarily on the Acquisition Agreements and Exploitation Agreements to assert that the performers agreed to (or never objected to) their performances being recorded and that the record labels had the authority to consent to exploitation of the recordings on behalf of certain performers, respectively. They do not put forward other evidence to establish that their exploitation of the recordings is authorized.[42] This limited universe of documents, with substantially identical material terms, is common to the Performer Class.[43] Moreover, the

---

consent by the same process in the same manner could establish predominance requirement); *McCurley*, *supra*, 331 F.R.D. at 173-74 (same); *Caldera v. Am. Med. Collection Agency*, 320 F.R.D. 513, 519 (C.D. Cal. 2017) ("Where a party has not submitted any evidence of express consent [for TCPA claim], courts will not presume that resolving such issues requires individualized inquiries.") In *Van Patten*, the Ninth Circuit relied on the text, purpose, and history of the TCPA, as well as an order of the Federal Communication Commission regarding the definition of consent. *Id.* at 1044-5. The decision, while not fully applicable here, is likewise persuasive.

[42] Defendant William Sagan stated that every document allegedly evidencing "artist[] consent, the deals with the labels, and the reps and warranties for the acquisitions" was produced in this case. (Weiner Reply Decl., Exh. 1 [Reply Sagan Depo.] at 177:21-178:5.) And, indeed, defendants relied entirely on these agreements to claim they had the right to register recordings in the collection with the Copyright Office before the institution of this litigation. (*See* Pearson Decl., Dkt. No. 126-6, Exhs. A-D.)

[43] In addition, each of the agreements indicated that certain recordings of the performing artists represented to be under contract with the record label might require *additional consent or confirmation directly from the performing artists*. (*See* Sony Agreement ¶ 1.2; UMG Agreement ¶ 4.4; Warner Agreement ¶ 1.2.) Defendants have offered no such evidence of additional consent

Exploitation Agreements offered by defendants do not purport to cover the audiovisual recordings that make up a substantial portion of the collection.  (*See* fn. 24, *supra*.)[44]

Thus, on the record before the Court, common issues would predominate as to proof of the performers' authorization.  The Court finds, as with the Composer Class, the presence of *individual* settlement agreements as to a relatively small number of putative class members would not overcome the number of common issues of fact and law with respect to the Performer Class.[45]

### F.     Rule 23(b)(2) Class

Plaintiffs also seek to certify the Composer and Performer Classes under Rule 23(b)(2).  Class certification is appropriate under Rule 23(b)(2) when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

In their complaint, plaintiffs seek injunctive relief to halt exploitation of the recordings at issue on defendants' Websites, in addition to damages provided by the Copyright Act.  Defendants contend that an injunctive relief class under Rule 23(b)(2) is prohibited when plaintiffs seek monetary damages on behalf of the class.  The Supreme Court in *Dukes*,

---

or confirmation, save the small number of individual settlement agreements here.

[44]  Defendants' ability to rely on the Warner Agreement as a defense to the Performer Class's claims is uncertain.  It provided that "[i]n the event that a Warner Artist initiates an action against Wolfgang. . .  regarding Wolfgang's exploitation of any Warner Artist Concert Recording (other than a Covered Warner Artist Concert Recording) *Wolfgang will not rely upon or use in any way the agreement between the parties as to joint copyright ownership in any such action or to justify Wolfgang's exploitation activities*." (Sagan Exh. O, Warner Agreement ¶ 3.1, emphasis supplied.)

[45]  Plaintiffs argue that defendants have no evidence of contemporaneous consent by the performers and cannot cure lack of consent by way of agreements with record labels tens of years after the recordings.  Defendants argue that nothing in language of section 1101 requires "consent of the performer(s) involved" to be *in writing*, rather than oral or implied.  The Court does not reach the theoretical question of whether such evidence would be admissible, or whether retroactive consent is adequate.  First, defendants have not made such an evidentiary proffer.  Second, the Court notes that, in *ABKCO v. Sagan*, the court rejected these same documents on the issue of consent as inadmissible hearsay.  *ABKCO v. Sagan I*, 2018 WL 1746564 at *13 n.25 ("The agreements purport to contain out of court statements by the artists (*i.e.*, that they consented to the fixation and exploitation of their recordings), within a document that is itself an out of court statement.").

examining the question of whether a class seeking injunctive relief and damages could be certified under Rule 23(b)(2), held that individualized injunctive relief, like the backpay relief sought there, would not be subject to that rule:

> In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant. Similarly, it does not authorize class certification when each class member would be entitled to an individualized award of monetary damages.

*Dukes*, 564 U.S. at 360–61 (emphasis in original). The Court in *Dukes* considered a case where *only* a Rule 23(b)(2) class was certified, yet damages were also sought on a classwide basis. *Dukes* expressed concerns that certifying a 23(b)(2) class to obtain individualized damages would be contrary to the procedural protections, such as notice and a right to opt out, attendant to a Rule 23(b)(3) class. *Id*. at 362-63.

Here, the Court finds the concerns expressed in *Dukes* inapplicable. The damages the Composer and Performer Classes seek would not result in individualized *injunctive* relief. *Cf. Barrett v. Wesley Fin. Grp., LLC*, No. 13CV554-LAB (KSC), 2015 WL 12910740, at *7 (S.D. Cal. Mar. 30, 2015) (where plaintiff seeks both declaratory and monetary relief, the court may certify both Rule 23(b)(3) class and Rule 23(b)(2) injunction-seeking class "if a single injunction would provide relief to each member of the class") (citing *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 544 (9th Cir. 2013)). Due process concerns are diminished where a Rule 23(b)(3) class is also certified. Thus, the Court finds certification of the classes under Rule 23(b)(2) to be appropriate as well.

## VII. CONCLUSION

Based upon the foregoing, the Court **ORDERS** as follows:

1. the motion for class certification under Rules 23(b)(2) and (b)(3) is **GRANTED** as to the Composer Class defined as:

> All owners of the musical compositions encompassed in sound recordings and audiovisual works of non-studio performances reproduced, performed, distributed, or otherwise exploited by Defendants during the period from September 14, 2014, to the present.

and the Performer Class defined as:

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

All persons whose non-studio live musical performances are captured in the recordings of sounds or sounds and images which have been reproduced, performed, distributed, or otherwise exploited by Defendants during the period from September 14, 2014, to the present.[46]

The Court will entertain any arguments for sub-classing, whether by the Exploitation Agreement covering the recording(s) or performer(s), or by other criteria. Likewise, the Court will consider the parties' proposals for the best notice practicable to the members of the classes.

Defendants shall provide class lists identifying the members of the Composer and Performer Classes to plaintiffs no later than **May 15, 2020.**

The parties are directed to meet and confer on these issues and submit a single joint brief on the issues of subclassing and notice, preferably with side-by-side comparisons of their proposals on issues as to which they cannot reach agreement. The joint brief shall be no more than 15 pages and shall be filed by **June 12, 2020**.

This terminates Dkt. Nos. 107, 109, 120, 126, 128, 145, and 167.

**IT IS SO ORDERED.**

Dated: April 10, 2020

**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

---

[46] The Court has modified the definition of the Performer Class from that offered by plaintiffs in order to hew more closely to the language of section 1101.

37